UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RITA BATHIARD** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ISLAMIC REPUBLIC OF IRAN** *et al.*, <br><br> Defendants. | Case No. 16-cv-1549 (CRC) |
| **ESTATE OF RENE BATHIARD** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ISLAMIC REPUBLIC OF IRAN** *et al.*, <br><br> Defendants. | Case No. 17-cv-2006 (CRC) |

## MEMORANDUM OPINION

Before the Court are two cases arising out of the suicide bombings of the U.S. Embassy in Beirut, Lebanon in 1983 and of the Embassy Annex in 1984. Cesar Bathiard, a Lebanese citizen working at the Embassy, was among the 52 victims killed in the 1983 attack. His widow and two daughters brought suit under the Foreign Sovereign Immunities Act ("FSIA") against the Islamic Republic of Iran based on its complicity in the attack. Compl., Bathiard v. Islamic Republic of Iran ("Bathiard I"), No. 16-cv-1549 (Aug. 1, 2016). More of Cesar Bathiard's relatives filed suit in 2017, along with an additional victim injured in the 1983 Embassy attack, Hussein Mayassi, and his family members. Compl., Estate of Bathiard v. Islamic Republic of Iran ("Bathiard II"), No. 17-cv-2006 (Sept. 28, 2017). They were joined by a victim injured in the 1984 Embassy Annex attack, Khaled el Moghrabi, and his family members.

In 2018, the Court dismissed both cases as brought outside FSIA's statute of limitations. Bathiard I, 317 F. Supp. 3d 134, 143 (D.D.C. 2018); Order Dismissing Case, Bathiard II, No. 17-cv-2006 (Sept. 18, 2018). In 2019, the D.C. Circuit—holding that district courts may not *sua sponte* raise a statute of limitations defense in FSIA terrorism exception cases where the defendant fails to appear—reversed the Court's dismissal rulings and remanded. Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1114–15 (D.C. Cir. 2019). Upon remand, the Court entered default liability findings to both sets of plaintiffs. Bathiard I, No. 1:16-cv-1549 (CRC), 2019 WL 3412983, at *5 (D.D.C. July 29, 2019); Bathiard II, No. 17-cv-2006 (CRC), 2019 WL 5790356, at *5 (D.D.C. Oct. 17, 2019).

In both cases, the Court reserved judgment on damages and appointed Special Master Deborah Greenspan to issue a consolidated Report and Recommendation ("R & R"). Based on testimony, documentary evidence, and expert analyses, Special Master Greenspan has produced a comprehensive report making factual findings as to each plaintiff and recommending damages based on the legal framework established in prior state-sponsor-of-terrorism cases in this jurisdiction. After reviewing Ms. Greenspan's well-substantiated report, the Court will partially adopt its factual findings and recommendations. The Court will also address Plaintiff's motions for leave to amend the complaints to include demands for prejudgment interest.

## I. Standing

Under the FSIA's terrorism exception, "those who survived an attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries," while "estates of those who did not survive can recover economic losses stemming from the wrongful death of the decedent." Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d

24, 37 (D.D.C. 2012).  Moreover, immediate family members of both types of direct victims "can recover solatium for their emotional injury." Id.

Before the Court may consider the merits of each plaintiff's claim for damages, it must first address the threshold question whether such claims may be brought by the five estate-plaintiffs in these consolidated cases.[1]  Where an estate-plaintiff invokes FSIA's private cause of action, it must first establish the estate's standing, *i.e.*, "[its] power . . . to bring and maintain legal claims." Taylor v. Islamic Republic of Iran, 811 F. Supp. 2d 1, 12 (D.D.C. 2011); see 28 U.S.C. § 1606 (stating that the purpose of creating a federal cause of action under § 1605A is to ensure that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances").  That threshold inquiry is "governed by the law of the state which also governs the creation of the estate." Taylor, 811 F. Supp. 2d at 12.  In this case, since all five decedents are citizens of Lebanon, the Court must examine Lebanese law.

Lebanese law recognizes claims for emotional distress caused by the death or injury of an immediate family member.  See, e.g., Barry v. Islamic Republic of Iran, No. 16-cv-1625 (RC), 2020 WL 549296, at *14 (D.D.C. Feb. 4, 2020); Estate of Doe v. Islamic Republic of Iran ("Estate of Doe I"), 808 F. Supp. 2d 1, 21 (D.D.C. 2011) ("Lebanese law allows for the award of compensation for . . . emotional distress [] suffered as the result of the wrongful death or tortious injury of an immediate relative." (citing Pl.'s Exh. 1, Lebanese Law Opinion §§ 3.1–3.2)).  Lebanese law also permits direct victims to bring claims for "mental distress as well as physical or economic damage."  Pl.'s Exh. 1, Lebanese Law Opinion § 2.2, Estate of Doe v. Islamic

---

[1] These claims are brought by the estates of direct victims Cesar Bathiard and Hussein Mayassi as well as the estates of immediate family members Rene Bathiard, Raymond Bathiard, and Rasmieh el Moghrabi.

Republic of Iran, No. 08-cv-540 (Nov. 22, 2010), ECF No. 35-1.  "[U]pon the death of the original claimant," the distress or physical or economic damage that the claimant suffered is "considered to be 'automatically transferred to his or her heirs by operation of law,' authorizing the heirs to assert the claim for compensation on behalf of the decedent."  Barry, 2020 WL 549296, at *14 (quoting Legal Opinion on Lebanese Law 2); see also Estate of Doe I, 808 F. Supp. 2d at 21 ("[U]nder Lebanese law, an heir of a decedent may bring [a claim] on behalf of the heirs to recover damages for emotional distress suffered by a decedent before death." (citing Lebanese Law Opinion § 3.1).[2]

The legal opinion on Lebanese inheritance law submitted by Plaintiffs, R & R, Exh. 55 ["Lebanese Legal Op."], explains that under Lebanese law, individual heirs and their respective shares are determined by certain religious law principles.  Id. at 4.  Lebanese law does not provide a procedure for court appointment of a personal representative (as is common in the United States); rather, family members may agree amongst themselves to give one individual the authority to undertake the procedural steps necessary to marshal the assets of the estate.  R & R 28; Lebanese Legal Op. 4.  Each estate's personal representative has attested that he or she has been so chosen by surviving family members to represent the estate.  R & R 28–29, Exhs. 4, 17, 21, 52, 53.

---

[2] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  The Court therefore adopts the findings of Judge Contreras, Barry, 2020 WL 549296, at *11 n.26, 14, and Judge Bates, Estate of Doe I, 808 F. Supp. 2d at 21, on Lebanese law based on the expert legal opinions submitted to them in those cases.  Cf. Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 387 (D.D.C. 2015) ("In light of [Federal Rule of Evidence 201(b)] and the numerous FSIA cases in recent years giving rise to nearly identical factual and legal issues, this Court and others in this District have frequently taken judicial notice of earlier, related cases arising under the state-sponsored terrorism exception to foreign sovereign immunity.").

Based on the legal opinion on Lebanese law submitted by Plaintiffs, the affidavits from the estates' personal representatives, and prior case law in this jurisdiction, the R & R concluded that the five estate-plaintiffs have standing to seek damages under FSIA's private cause of action.  R & R 28–29.  The Court agrees and adopts these findings and recommendations in full.

## II.   Damages[3]

To recover under the FSIA, plaintiffs "must prove the amount of the damages by a reasonable estimate consistent with th[e] [D.C. Circuit's] application of the American rule on damages."  Hill v. Republic of Iraq, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotation marks omitted).  "In determining the reasonable estimate, courts may look to expert testimony and prior awards for comparable injury."  Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 82 (D.D.C. 2017) (internal citations omitted).

### A.   Compensatory Damages

#### 1.   *Economics Losses of Direct Victims*

Under the FSIA, the estate of a deceased direct victim may recover "economic damages" for lost future earnings.  28 U.S.C. § 1605A(c); see Roth, 78 F. Supp. 3d at 401–02.  "Such damages may be proven by the submission of a forensic economist's expert report" that is "based on reasonable assumptions about the plaintiff's likely earnings if she had survived, including the length of time she would have worked and received retirement benefits."  Roth, 78 Supp. 3d at 402 (citing Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 24 (D.D.C. 2009)).

---

[3] The Court recounted the factual background of the 1983 Embassy attack and 1984 Embassy Annex attack in its opinions awarding Plaintiffs default judgment.  See Bathiard I, 2019 WL 3412983, at *1, 3–4; Bathiard II, 2019 WL 5790356, at *1–2.  It incorporates those facts by reference here and will reproduce only the facts pertinent to the question of damages.

The R & R concluded that the estate of Cesar Bathiard, who was employed as a driver for the U.S. Embassy in Beirut at the time of the 1983 attack, was entitled to economic damages based on one such economist's expert report.  R & R 30–31; id., Exh. 56 ("Econ. Expert Report").  The expert report assumed that Mr. Bathiard would have worked through a standard work life, that his salary would have increased with inflation, and that a portion of his earnings would have been consumed for his own needs.  R & R 30–32; Econ. Expert Report 3–4.  It then applied a standard methodology for computing future lost earnings based on Mr. Bathiard's salary at the time of his death as reported by the U.S. Embassy.  Econ. Expert Report 4, Tables 1 & 2; R & R, Exh. 54.  Based on those assumptions and calculations, the expert report concluded that Mr. Bathiard's estate was entitled to $287,395 in lost earnings.  The Special Master found it reasonable to rely upon the expert report's assumptions and calculations, and the Court agrees.[4]  The Court will therefore award $287,395 in economic losses to the estate of Cesar Bathiard.[5]

   2.  *Pain and Suffering of Direct Victims*

Moving to direct victims' claims for pain and suffering damages, the Court begins by acknowledging what it has said in the past: the process of assessing pain and suffering is an imperfect science, as no amount of money can properly compensate a victim and his family for their suffering during and after a terrorist attack.  See Goldstein v. Islamic Republic of Iran, 383 F. Supp. 3d 15, 19 (D.D.C. 2019) (Cooper, J.); Cohen v. Islamic Republic of Iran ("Cohen II"), 268 F. Supp. 3d 19, 24 (D.D.C. 2017) (Cooper, J.).  "In the interest of fairness, however, courts

---

[4] The total economic damages figure has not been discounted to present value.  See Econ. Expert Report 4.  The Court will address this issue in Part III.

[5] The two injured direct victims, Messrs. Mayassi and Moghrabi, did not seek recovery for economic losses.

6

strive to maintain consistency of awards as between the specific plaintiffs and among plaintiffs in comparable situations." Goldstein, 383 F. Supp. 3d at 19. Courts in this jurisdiction therefore follow a "general procedure for the calculation of damages" in FSIA terrorism-exception cases "that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages [for pain and suffering]." Wultz, 864 F. Supp. 2d at 37–38 (citing Peterson v. Islamic Republic of Iran ("Peterson II"), 515 F. Supp. 2d 25, 54 (D.D.C. 2007), abrogated on other grounds by Mohammadi v. Islamic Republic of Iran, 782 F.3d 9, 15 (D.C. Cir. 2015)). Examples of substantial injuries include "compound fractures" and "severe flesh wounds." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 84 (D.D.C. 2010). The $5 million award baseline may be adjusted up or down "based on the nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment." Goldstein, 383 F. Supp. 3d at 19 (citing Peterson II, 515 F. Supp. 2d at 52 n.26).

Special Master Greenspan applied this framework to the three direct victims. Because the evidence showed that Cesar Bathiard was killed instantly by the suicide bomb attack, the R & R did not recommend any pain and suffering damages for his estate. R & R 32–34. The Court adopts this finding and recommendation in full. See, e.g. Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 42–3 (D.D.C. 2014) ("[T]he record does not support the award of pain and suffering damages to the estates of these deceased victims because it contains no evidence indicating that they suffered before succumbing to their injuries."); Oldham v. Korean Air Lines Co., Ltd., 127 F.3d 43, 56 (D.C. Cir. 1997) (noting that in pre-death suffering cases, "the key factual dispute turns on whether the [victims] were immediately rendered unconscious").

The Special Master recommended that the two victims injured in the Embassy attacks receive pain and suffering damages. The R & R recounts that Khaled el Moghrabi, a bodyguard

7

injured in the 1984 U.S. Embassy Annex attack, was sitting at a table in the basement of the Embassy Annex when it was bombed.  R & R 15.  The table where he had been sitting fell on him, causing cuts on his back and arms, bruises on his knees and legs, and sharp pain in his back.  Id. at 15–16.  Moghrabi continues to suffer from back pain, for which he takes medication.  Id. at 16.  The memories of the attack still affect him, especially the guilt that he feels for having switched duty shifts on the day of the attack with another Embassy employee, who was killed in the attack.  Id. at 15–16.

As to Hussein Mayassi, the R & R recounts that he was working at the Embassy at the time of both the 1983 and 1984 attacks.  Id. at 20.  Mayassi passed away in 1999 and therefore there is no personal account in the record of what happened to him during the attacks.  Nonetheless, testimony from his family establishes that he arrived home after the 1983 attack with bandages on his face and arm, lacerations, and either a muscle strain or broken bone and that he had physical and emotional pain throughout his life.  Id. at 20, 36–37.[6]

In light of this evidence and a review of damages awards in similar cases, the R & R recommends an award of $3 million to Khaled el Moghrabi and $3.1 million to Hussein Mayassi.  The R & R concluded that a downward variance from the $5 million baseline was warranted for both plaintiffs because of the "less severe nature of the[ir] physical injuries in comparison to other cases that resulted in awards at the baseline or higher."  R & R 35, 37.  Compare id. with, e.g., Valore, 700 F. Supp. 2d at 84 (noting that substantial injuries warranting the $5 million baseline include "compound fractures" and "severe flesh wounds"); Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 21 (D.D.C. 2018) (awarding $5 million pain and suffering award to victim who

---

[6] There are no medical records documenting the injuries of either plaintiff.  R & R 16, 36–37.

sustained "numerous cuts, abrasions, and contusions," "many fragments of glass were embedded in [his] body," and, as a result of "being thrown against the wall by the blast, he also "had herniated and ruptured discs in [his] back, which have required several major surgeries," causing him to remain "in constant pain from these injuries," for which he "take[s] pain medications every day"). Presented with no evidence that either plaintiff suffered injuries of "substantial" degree or duration, Valore, 700 F. Supp. 2d at 84, the R & R concluded that Moghrabi and Mayassi's injuries were more comparable to those of Glenn Dolphin, a plaintiff in Peterson II, R & R 35. Judge Lamberth awarded Mr. Dolphin $3 million in pain and suffering damages for "injuries in the back, arm and head from being hit with shrapnel *from the attack*" and "lasting and severe psychological problems from the attack." 515 F. Supp. 2d at 54 (emphasis added).

The Court concurs with the Special Master that downward variances are warranted for both Mr. Mayassi and Mr. Moghrabi. It concludes, however, that the departures should be even greater than the R & R recommends because they suffered even less severe injuries than Dolphin in Peterson II. Mr. Dolphin was in the barracks when a bomb exploded directly within, causing shrapnel to penetrate his shoulder, a metal insert from the door to strike him in the head, and shattered glass windows to cut his arm. Dolphin R & R 3, Peterson II, No. 01-cv-2094 (July 28, 2006), ECF No. 174. Dolphin experienced "excruciating pain emanating from his back," his "arm became infected and it took almost a week from the infection to be controlled," and his "hearing has never fully recovered from the effects of the explosion." Id. at 5–6. By contrast, there is no evidence that either Mr. Mayassi or Mr. Moghrabi were in the direct line of the immediate attack or suffered as severe or as lasting injuries.

In the Court's view, they are more directly comparable to Charles Frye in Peterson II, who "was minimally injured from small arms fire occurring just after the initial bomb explosion" and "has experienced resulting nerve pain and foot numbness" and "lasting and severe

9

psychological problems from the attack." Peterson II, 515 F. Supp. 2d at 55. Like Mr. Frye, both Mr. Mayassi and Mr. Moghrabi were "minimally injured" during the Embassy attacks and have experienced some enduring physical and emotional pain. Id.; see also Frye R & R 2, No. 01-cv-2094 (Nov. 16, 2005), ECF No. 85 (finding that Frye "has scar tissue pressing on nerves and gets cramps," "[h]is foot gets numb," and he has anger and paranoia). Frye was awarded $2 million, Peterson II, 515 F. Supp. 2d at 55; the Court will reduce the awards for Messrs. Mayassi and Moghrabi to the same amount.[7]

### 3. Solatium Damages for Family Members

"The state-sponsored terrorism exception to the FSIA expressly contemplates the award of solatium damages to the close relatives of terrorism victims." Fritz v. Islamic Republic of Iran, 324 F. Supp. 3d 54, 61–62 (D.D.C. 2018) (citing 28 U.S.C. § 1605A(c)). "Solatium damages are intended to compensate for the 'the mental anguish, bereavement and grief that those with a close personal relationship to a [direct victim] experience.'" Goldstein, 383 F. Supp. 3d at 21 (quoting Belkin, 667 F. Supp. 2d at 22). The amount of solatium damages awarded to each family member depends in part on "the 'nature of the relationship' between the family member and victim, and 'the severity of the pain suffered by the family member.'" Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) (quoting Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)). As with pain and suffering damages for direct victims, courts strive to maintain consistency of awards as between the specific plaintiffs and among plaintiffs in comparable situations. Courts therefore apply a

---

[7] The R & R recommended a slightly higher award for Mr. Mayassi because it found that his "emotional injuries were more severe than those of Mr. Moghrabi." R & R 37. The Court does not see anything in the record to support this finding so declines to adopt it.

framework that begins with the presumption that "[s]pouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings."  Id.  Children who lose parents typically receive awards on par with parents who lose children.  See, e.g., Onsongo v. Republic of Sudan, 60 F. Supp. 3d 144, 151 (D.D.C. 2014); Owens v. Republic of Sudan, 71 F. Supp. 3d 252, 260 (D.D.C. 2014).  For relatives of victims killed by terrorist attacks, courts begin with "a framework in which spouses of deceased victims were awarded approximately $8 million, while parents received $5 million and siblings received $2.5 million."  Anderson v. Islamic Republic of Iran, 839 F. Supp. 2d 263, 266 (D.D.C. 2012) (citing Heiser, 466 F. Supp. 2d at 269).  "For relatives of victims physically injured by terrorist attacks, courts have applied a framework whereby awards are valued at half of the awards to family members of the deceased—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively."  Kaplan v. Hezbollah, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (internal quotation marks omitted).  Moreover, "solatium awards for relatives of victims should be proportionate to the pain-and-suffering awards to the victims themselves."  Goldstein, 383 F. Supp. 3d at 22 (citing Cohen II, 268 F. Supp. 3d at 26).  Therefore, where courts depart from the baseline pain and suffering award for direct victims, a proportionate adjustment to their relatives' solatium damages may be in order.

    a. <u>Family Members of Cesar Bathiard</u>

Eight relatives of Cesar Bathiard—his wife, two daughters, the estate of his father, and four siblings—seek solatium damages.  Based on declarations and deposition testimony documenting their relationships with Cesar and the pain that they suffered as a result of his death, the R & R concludes that all of Mr. Bathiard's relatives are entitled to solatium damages.  Applying the Heiser framework, the R & R recommends that his wife receive $8 million, his two

daughters each receive $5 million, the estate of his father receive $5 million, and his four siblings each receive $2.5 million. R & R 43–45.

The Court adopts these findings and recommendations with one exception. Cesar Bathiard had two daughters at the time of his death—Rita Bathiard and Pascale Mazarei Batyar. Rita, who was then four years old, testified as to the vivid, fond memories that she had of her father, whom she described as her hero, the nightmares that she had after his death, how she felt like she had lost two parents because her mother transformed after her father's death, and the abuse that she suffered at the hands of her stepfather, whom, in her view, her mother would never have married were it not for her father's death. R & R 9–10. By contrast, the R & R recounts that Pascale, who was only 11 months old at the time of Cesar's death, had no memories of him and in fact grew up thinking that her stepfather, who also abused her, was her biological father. Id. at 7. Only in her 20s did Pascale learn about Cesar and how he died. Id.

Children who are toddlers at the time of their parent's death may still recover the full $5 million baseline solatium award. Indeed, Rita Bathiard's compelling testimony about her fond memories of her father and the devastating effect that his death had on her life establishes pain and suffering on par with other children of parents who have died in terrorist attacks. See, e.g., Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 95 (D.D.C. 2014) (confirming awards of $5 million to children as young as three years old at the time of attack); Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 50 (D.D.C. 2014) (confirming $5 million award to child who was two years old at time of attack).

The Court concludes, however, that a downward variance is warranted for Pascale Mazarei Batyar. Heiser contemplates that the amount of solatium should vary based on "the 'nature of the relationship' between the family member and [the direct] victim." Heiser, 466 F.

12

Supp. 2d at 269 (quoting Haim, 425 F. Supp. 2d at 75). In Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136 (D.D.C. 2010), Judge Urbina concluded that an upward variance was warranted for a relative in part because he was "very close" to the direct victim. Id. at 158. The same logic suggests that Ms. Batyar, who has no memories of her biological father and spent the first two decades of her life not knowing that he existed, should receive less than the baseline. Although Ms. Batyar testified credibly about the impact of her learning about Cesar and his death on her life and the abuse that she suffered at the hands of her stepfather, the gap in her awareness of her father's death in the first two decades of her life warrants a downward variance. Cf. Goldstein, 383 F. Supp. 3d at 22–23 (affirming downward variance for sibling who was born two days after the attack). Accordingly, the Court will reduce Ms. Batyar's award to $3.5 million in solatium damages.

      b.   Family Members of Hussein Mayassi

Mr. Mayassi's five children seek solatium damages. Based on testimony and affidavits from each of the children, the R & R concluded that each had a close relationship with their father and suffered distress because of his injuries from the attacks. R & R 29–25, 46. The Special Master therefore awarded each child a solatium award of $2.5 million, the baseline for children of direct victims injured in a terrorist attack. Id. at 46; see, e.g., Peterson II, 515 F. Supp. 2d at 51 (awarding $2.5 million in solatium to child of injured direct victim); Onsongo, 60 F. Supp. 3d at 151 (same).

Although the Court adopts these factual findings and agrees with the R & R that each child has established his/her entitlement to solatium, it concludes that downward variances are appropriate in light of the principle that "solatium awards for relatives of victims should be proportionate to the pain-and-suffering awards to the victims themselves." Goldstein, 383 F.

13

Supp. 3d at 22 (citing Cohen II, 268 F. Supp. 3d at 26).  Because the Court scaled down Mr. Mayassi's pain and suffering award to $2 million, the Court will adjust the solatium awards for his children to $1.5 million each.  See id. (making a similar adjustment).

### c.  Family Members of Khaled el Moghrabi

The estate of Khaled el Moghrabi's mother and three of his siblings seek solatium damages in connection with the 1984 Embassy Annex attack.  Affidavits and testimony in the record, the Special Master concluded, established that each of Mr. Moghrabi's siblings and his mother were close to him and were devastated by his injuries in the attack.  R & R 17–19, 46.  Applying the Peterson II framework, the R & R recommended that his mother receive $2.5 million and his siblings each receive $1.25 million in solatium damages.  Id. at 46.

The Court concurs with the R & R's factual findings and its conclusion that each relative is entitled to solatium damages.  The R & R's recommendations as to amount, however, assume that each relative is entitled to the baseline solatium award.  See, e.g., Kaplan, 213 F. Supp. 3d at 38 (noting that the baseline framework presumes awards of "$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively" (internal quotation marks omitted)).  Again, because the Court scaled down Khaled el Moghrabi's pain and suffering damages to $2 million, the Court finds it appropriate to adjust the solatium awards to his family members as follows: $1.5 million to the estate of his mother and $750,000 each to the three siblings.  See Goldstein, 383 F. Supp. 3d at 22 ("[S]olatium awards for relatives of victims should be

14

proportionate to the pain-and-suffering awards to the victims themselves." (citing Cohen II, 268 F. Supp. 3d at 26)).

B. Punitive Damages

The plaintiffs' complaints in both cases also include a demand for punitive damages.[8] In Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017), the D.C. Circuit held that the FSIA terrorism exception "does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the [2008] passage of § 1605A." Id. at 812. Because the conduct complained of here occurred in 1983 and 1984, several decades before § 1605(A)'s enactment, the rule announced in Owens precludes an award of punitive damages. See, e.g., Goldstein, 383 F. Supp. 3d at 24 (declining to award punitive damages where the conduct at issue occurred before § 1605A's enactment); Fritz, 324 F. Supp. 3d at 65 (same).[9]

### III. Motions to Amend Complaint

Plaintiffs have also filed motions to amend the complaints in both cases to include demands for prejudgment interest. Under Federal Rule of Civil Procedure 15(a)(2), leave to amend "should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failures to cure deficiencies, or futility." Richardson v. United States, 193 F.3d 545, 548–49 (D.C. Cir. 1999). An amended complaint would be futile if "the proposed claim would not survive a motion to dismiss [under Rule 12(b)(6)]." James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

---

[8] The R & R did not make a recommendation on punitive damages.

[9] Although Cohen II awarded punitive damages in the FSIA context, 268 F. Supp. 3d at 28, it was decided prior to the Circuit's decision in Owens, 864 F.3d at 812.

To begin, the Court finds that the discretionary factors counseling against allowing amendment—"undue delay, bad faith, undue prejudice to the opposing party, [or] repeated failures to cure deficiencies"—are not present here. Richardson, 193 F.3d at 548–49. Plaintiffs explain that they "inadvertently omitted" demands for prejudgment interest from the prior complaints. Pl. Mot. to Amend ¶ 5, Bathiard I, No. 16-cv-1549; Pl. Mot. to Amend ¶ 5, Bathiard II, No. 17-cv-2006. Defendants have not entered an appearance; they therefore cannot complain that they were "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely." In re Vitamins Antitrust Litig., 217 F.R.D. 30, 32 (D.D.C. 2003) (internal quotation marks omitted). Nor do the proposed amendments "substantially change[] the theory on which the case has been proceeding"; they merely seek an additional form of relief. Djourabchi v. Self, 240 F.R.D. 5, 13 (D.D.C. 2006).

The Court still must consider, however, whether it would be futile to permit amendments to include demands for prejudgment interest. "The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations." Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). The Court has previously declined to tack prejudgment interest onto a compensatory damages award for nonpecuniary injuries, which include pain and suffering and solatium damages. See Goldstein, 383 F. Supp. 3d at 23–24. "[B]ecause nonpecuniary damages . . . are 'designed to be fully compensatory,'" the Court reasoned, they are 'complete and prejudgment interest is not necessary to make the plaintiffs whole.'" Id. at 23 (quoting Cohen II, 268 F. Supp. 3d at 27 n.2); see also Wyatt v. Syrian Arab Republic, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (denying prejudgment interest because "pain and suffering and solatium damages are both designed to be fully compensatory").

While the Court is aware of well-reasoned decisions in this jurisdiction that have come out the other way, see, e.g., Fritz, 324 F. Supp. 3d at 63–64, it continues to conclude that prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation. As in Goldstein, 383 F. Supp. 3d at 24, the Court "finds inapplicable here a premise that Fritz and other decisions have used to justify a contrary result":

> Fritz noted that "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks," which means such awards are "best viewed as fixed at the time of the loss" and that prejudgment interest should therefore be awarded "to account for the time that they have not had access to that full amount."

Id. (quoting Fritz, 324 F. Supp. 3d at 63). Here, the Special Master clearly accounted for the passage of time and the persistence of the plaintiffs' injuries in determining the appropriate compensatory damages awards. See, e.g., R & R 35 (noting that "Mr. Moghrabi *continues to* experience emotional injuries as a result of his experience and injuries" (emphasis added)); id. at 44 (finding that Cesar Bathiard's wife "has suffered and *continues to suffer* significant emotional distress as a result of his death" (emphasis added)). Plaintiffs are therefore not entitled to prejudgment interest on their nonpecuniary damages.

The Court reaches a different conclusion, however, with respect to the economic losses calculated for the estate of Cesar Bathiard. To be sure, courts have held that where "economic damages awarded to the estates of . . . [v]ictims are already discounted to present value," "a separate award of prejudgment interest would be duplicative." Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22, 54 (D.D.C. 2016); see also Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 407 (D.D.C. 2015) (same). Here, however, the economic expert report did not apply any discounting to bring the projected lost earnings to present value. See Econ. Expert Report 4. Therefore, in order to account for the time value of money, "the economic loss figures

17

recommended by the special master must be adjusted to reflect present discounted value." Khaliq v. Republic of Sudan, 33 F. Supp. 3d 29, 34 (D.D.C. 2014), aff'd sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017).

The Court will calculate the applicable interest using the prime rate—"the rate banks charge for short-term unsecured loans to creditworthy customers"—for each year.[10] Forman v. Korean Air Lines Co., 84 F.3d 446, 451 (D.C. Cir. 1996) (quoting In the Matter of Oil Spill by the Amoco Cadiz Off the Coast of France, 954 F.2d 1279, 1332 (7th Cir. 1992)) (agreeing with the Seventh Circuit "that the prime rate is not merely *as* appropriate as the Treasury Bill rate, but *more* appropriate" (emphasis in original)).[11]  And, "[u]sing the prime rate for each year is more precise than, for example, using the average rate over the entire period." Khaliq, 33 F. Supp. 3d at 35; Estate of Doe v. Islamic Republic of Iran ("Estate of Doe II"), 943 F. Supp. 2d 180, 185 (D.D.C. 2013) (recognizing the same).

The economic expert report arrived at a total of $287,395 in lost earnings by summing the estimated earnings losses for each year that Cesar Bathiard expected to work. See Econ. Expert Report, Table 2.  But, the annual earnings loss figures do not account for the time value of money: For example, the expert report calculates that Mr. Bathiard lost $7,822 in earnings in 1985, which is in "1985" dollars, not "2020" dollars. Id. at 4, Table 2.  To bring Mr. Bathiard's

---

[10] The Court downloaded historic prime rate figures for 1984 through 2020 from the Federal Reserve's website.  See App'x II; Federal Reserve, H.15 Selected Interest Rates, Data Download Program (Apr. 21, 2020), https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.

[11] The Treasury Bill rate "represents the return on a risk-free loan." Khaliq, 33 F. Supp. 3d at 35.  Forman recognized that the prime rate more closely approximated "the market rate," *i.e.*, "what the victim must pay—either explicitly if it borrows money or implicitly if it finances things out of cash on hand—and the rate the wrongdoer has available to it."  84 F.3d at 450–51.

1985 earnings into present value, the Court must increase the 1985 earnings loss figure by the prime rate for 1985 and then must increase that figure by the prime rate for 1986, and so on through 2020. Applying this methodology, the Court brought each year's earning loss figure into present value. Summing the present value of each year's earning loss figures results in a total of $1,074,636; the Court will increase the economic damages award to the estate of Cesar Bathiard to that amount. See App'x I.

The Court will thus grant in part Plaintiffs' motion to amend the complaint in Bathiard I to include a demand for prejudgment interest with respect to the economic damages awarded to the estate of Cesar Bathiard. Concluding that amendment would be futile in all other respects, the Court will deny the rest of Plaintiffs' motion to amend the complaint in Bathiard I and deny in full Plaintiffs' motion to amend the complaint in Bathiard II.

## IV.  Conclusion

In total, the Court will award $45,324,636 in damages to Plaintiffs, distributed as follows:

| Plaintiff | Economic Losses (w/ Interest) | Pain & Suffering Damages | Solatium Damages | Total Damages |
|---|---|---|---|---|
| Estate of Cesar Bathiard | $1,074,636 | $0 | $0 | $1,074,636 |
| Marcelle el Helou | $0 | $0 | $8 million | $8 million |
| Rita Bathiard | $0 | $0 | $5 million | $5 million |
| Pascale Mazarei Batyar | $0 | $0 | $3.5 million | $3.5 million |
| Antoine Jimmy Bathiard | $0 | $0 | $2.5 million | $2.5 million |
| Estate of Raymond Bathiard | $0 | $0 | $2.5 million | $2.5 million |
| Estate of Rene Bathiard | $0 | $0 | $2.5 million | $2.5 million |
| Francois Bathiard | $0 | $0 | $2.5 million | $2.5 million |

| | | | | |
|---|---|---|---|---|
| Giselle Bathiard | $0 | $0 | $2.5 million | $2.5 million |
| Khaled el Moghrabi | $0 | $2 million | $0 | $2 million |
| Estate of Rasmieh el Moghrabi | $0 | $0 | $1.5 million | $1.5 million |
| Habib al Moughrabi | $0 | $0 | $750,000 | $750,000 |
| Jamal al Moughrabi | $0 | $0 | $750,000 | $750,000 |
| Suzan al Moughrabi | $0 | $0 | $750,000 | $750,000 |
| Estate of Hussein Mayassi | $0 | $2 million | $0 | $2 million |
| Abdul Mayassi | $0 | $0 | $1.5 million | $1.5 million |
| May Mayassai | $0 | $0 | $1.5 million | $1.5 million |
| Tarek Mayassi | $0 | $0 | $1.5 million | $1.5 million |
| Walid Mayassi | $0 | $0 | $1.5 million | $1.5 million |
| Zack Mayassi | $0 | $0 | $1.5 million | $1.5 million |

A separate Order accompanies this Memorandum Opinion.

Date: <u>April 24, 2020</u>

CHRISTOPHER R. COOPER
United States District Judge